May it please the Court, my name is Kate Poole. I'm here today on behalf of Plaintiff and Appellant Environmental Group. This case is about the future of the threatened delta smelt, a species that's perched on the edge of extinction, and whether the U.S. Bureau of Reclamation has complied with Section 7 of the Endangered Species Act before entering into 25- and 40-year-long contracts that promise to divert millions of acres feet of water annually out of the Bay Delta estuary, which serves as home and critical habitat to the delta smelt. The District Court agreed with plaintiffs that no adequate Endangered Species Act analysis was performed on the impacts of these contracts on the smelt. But the Court denied plaintiffs' claims on two threshold issues of standing and discretion, both of which we asked this Court to revert. An appeal, defendants have raised a third threshold issue of mootness, which also should be rejected. Each of these issues boils down to the question of whether the Bureau could have negotiated terms in these long-term water delivery contracts that would be more protective of the smelt had the agency looked at the contracts through the proper Section 7 lens. The answer is yes. The Bureau could have and still can negotiate more protective terms in these contracts, but it's not yet done the analysis that Section 7 requires to ask you what those terms should be. Well, if they did so, they'd do so under the 2008 BIOB, correctly? Correct. It's possible that they would, Your Honor. Why wouldn't they? I mean, I think the earlier BIOBs are swept away by the decision of the district judge who said, you're right, you win. I'm going to put in place an injunction. I'm going to give enhanced protection that NRDC requests. And then that was done, as I understand it, in 06 and 07. And then in 08, the Bureau comes up with a new BIOB, and we can talk about whether the contract was discussed or it wasn't discussed. But the NRDC now is in step with the Bureau of Reclamation and agrees that the plan will, in fact, protect the smelt, correct? You're correct, Your Honor, that NRDC is siding with the federal agencies in defense of the 2008 BIOB. It's not sufficient, in my opinion. We do believe it's a necessary level of protection. However, it's not sufficient. And you've hit upon the key issue there, which is whether the contracts at issue here were actually analyzed in part of that 2008 BIOB. And they clearly weren't. They were actually explicitly taken off the table because these contracts, which were executed in 2005, were taken as a given and assumed as fixed. They had been reviewed by the service under Section 7 in 2004-2005, correct? The contracts, yes. The Bureau did do a Section 7 consultation on the execution of these contracts in 2005. However, that consultation was explicitly tiered to the 2005 biological opinion, which the district court found invalid. Now, the relief that we're seeking is that the Bureau needs to go back and look at its decision to execute these contracts and the specific terms of these contracts in the context of a Section 7 analysis, and that has not yet been done anywhere in the 2005 consultation or in the 2008 consultation. Now, let me address the threshold issues in turn. I'll turn first to standing and then address mootness and discretion. The question for plaintiff standing is whether plaintiffs can show that the contract at issue here could have been more protective of the smelt had the Bureau engaged in an adequate consultation. Plaintiffs have made that show. The delta smelts are adversely affected when water is diverted out of their habitat at certain times of the year, either before it reaches the delta because of upstream diversions or when it's exported out of the delta at the massive water project pumps in the southern delta. These harmful diversions would not be made but for the contract at issue here, each of which contains a number of terms that have the potential to affect when and how much water is delivered out of the delta, and that could be made more protective of the smelt. For example, the contracts contain terms regarding the timing of water delivery, which can have a profound effect on smelt because young smelt rear in the delta in the spring and delivering large amounts of water to the delta-Mendota Canal contractors from the export pumps during this time suck in smelt into the pumps and kill them. In addition, the pricing terms in the contract affect the overall amount of water demanded and can reduce the amount of water diverted for consumptive use and increase the amount available for the smelt. And of course, the terms governing the total amount of water delivered under the contract and whether and when those quantities can be lawfully reduced also has a significant effect on the amount of freshwater left in the delta and the quality and quantity of its habitat. So you're seeking to open up the contract so that you can have the EPA and the Bureau look at whether the threshold levels should be reduced or the price should be modified so that less water just by contractual agreement can be siphoned away from the areas where the smelt is responding or where their habitat is. And it's not simply the water quantity term, which is all the district court and the defendants here have really focused on. It's also the timing of diversion, which have a big impact, the pricing, the water shortage provision, a number of individual contract terms that affect how much water is demanded and taken out. Were none of those issues discussed in the 2008 buyout? What the 2008 buyout was looked at the joint water project operations as a whole of the Central Valley Project and California State Water Project. And what it decided was that those operations, which assumed that these contracts were in place, jeopardized the continued existence of the smelt, which gives us a good indication that these contracts came too much. And the protections that it put in place were global. In other words, they said the smelts require more flow through the delta in the fall of certain years and the smelts require less water exported out of the delta in the spring when smelts are particularly vulnerable. The next step that needs to happen is that the Bureau needs to look at the contracts, which make those water demands possible, put them in place and say, how can we tinker with the terms of these contracts to make them compatible with the 2008 biological opinion? It may be that simply adjusting the timing terms does it. We don't know the answer because the Bureau and the Fish and Wildlife Service haven't done the analysis. Well, but the Bureau has the authority to limit the restrictions, to restrict the water to be in compliance with the 2008 buyout, correct? Well, the Bureau has that authority for one set of contracts at issue here, the Delta Mendoza contracts. It has, those contracts contain what's called a no liability provision. And that provision, again, let me stress, only affects the water quantity terms. It doesn't affect the timing, pricing or other terms that could affect the smelts. And even with regard to that water quantity term and the no liability provision, the question before you for scanning purposes is whether that term could be made more protective under an adequate Section 7 consultation and it clearly could because a contract that starts with a reasonable quantity term based on a level of deliveries that will not jeopardize the smelt would be far more protective of the smelt than what we have here, which is a promise of excessive deliveries that can be reduced on an annual basis, but which is subject to certain procedures and that may subject the Bureau to liability in the end. The other part of the district court's ruling on the Delta contract was that the no liability clause was a break in the chain of causation. That's correct. What do you make of that? Why was the district court wrong with that argument? Well, it's wrong because the plaintiffs continue to suffer actual injury that's caused by the contract, even with those contracts in place. And let me give you a tangible example of that. The no liability provision essentially causes a lag time in compliance. And the way the 2008 biological opinion is set up, it establishes a range of allowable flows created by the export pumps that is typically only ratcheted down to the most protective level after a number of smelts have been actually killed by the pumps, which is the harm in a plaintiff's compliance. The district court explained this, how it operated in 2010 at 693 F sub second at 1148 to 49, and there the 2008 biop protections weren't triggered until smelts were actually killed by the pumps. If the contract contained more reasonable terms to start with, the Bureau could also start at the more protective level and wouldn't have to wait for harm to actually occur to the smelt before it ratcheted down. And that's the kind of relief that would be available if an adequate consultation occurred. And the district court said with respect to the SRS contract, I may get this wrong, I'm getting a little confused, but I think he said that there was standing with respect to the SRS contract. That's correct. But he said, well, Section 7 doesn't apply here, so it's discretionary. That's right. Is that right? That's wrong. That's what the district court held. Let me tell you why the district court held that wrong. Let me tell you, the one thing that troubled me about your argument there is how you relate California law, water law, the obligation, the historical right of those who are receiving water from the Sacramento River or the Reclamation Act. And apparently they're entitled to that water no matter what. Well, the settlement contractors claim a certain level of water rights, pre-existing historical water rights. Those have never been resolved. There's never been a formal adjudication of that right or what it would be and whatnot. Right. Nonetheless, they apparently have some right to water. They do, but we don't know what the quantity of those rights are. So we don't know what, in the absence of these contracts, how the system would operate because there's an ongoing dispute between the Bureau and the settlement contractors about the nature of their historic rights. But you never actually have to get to that issue to determine that the Bureau had sufficient discretion here to modify terms in the settlement contracts to benefit the smelt. And again, it's similar to the standing issue because if you simply look at other terms besides the water quantity terms, the Bureau could have made changes that aren't even affected by Article 9 of the original contracts, which is what the district rate system is on, such as timing, such as pricing, that could have been more to the benefit of the smelt. And in fact, the Bureau did make significant changes to the settlement contract when it renewed them in 2005. Those changes included negotiating reduced water quantity terms, significantly increased project water rates, it changed the timing of deliveries under the contract, and it added a brand-new no liability provision that allows project water quantities to be reduced when needed to meet legal obligations. All of those new terms may benefit the smelt and demonstrate that the Bureau, in fact, had an exercise sufficient discretion to renew it to trigger Section 7. Now, the district court misapplied two different legal standards to reach the opposite conclusion. It drew an erroneous standard from the Home Builders case to hold that Section 7 is not required if an agency's discretion is substantially constrained, as opposed to whether the agency has any discretion that could apply to the benefit of the species. But under Home Builders and this court's subsequent decision in National Wildlife Federation versus National Marine Fisheries Service, the relevant question is whether it's possible for the agency to simultaneously obey its other mandates and the ESA's mandate. In this case, the Bureau's other mandates are entirely consistent with the ESA's mandate. The contracts themselves recognize that they're executed pursuant to federal reclamation law, including the 1992 Central Valley Projects Improvement Act, which not only allows but requires the Bureau to make protection of fish and wildlife a co-equal project priority with irrigation and to comply with the Endangered Species Act. The second misapplied legal standard that the district court made was holding that the Bureau had to have unilateral authority to impose contract terms against the will of the other contracting parties to wield sufficient discretion to trigger Section 7. And that standard is inimical to the basic definition of contract, which requires mutual assent of the parties. Since the act of federal contracting is explicitly included in the regulatory definition of agency action subject to the Endangered Species Act, the district court's reading can't be reconciled with long-standing ESA requirements. Nor is it reconcilable with this court's decision in Hopkins that found a renewal of the CBP water delivery contract on mutually agreeable terms involved to the exercise of discretion under Section, or by the Bureau, excuse me, that triggered Section 7. Because the Bureau had sufficient discretion to change the settlement contract terms to benefit this amount, the district court's ruling that it wasn't required should be overturned. Now, let me turn briefly to Mootness. Before you do, I wanted to get this straight. As I understand it, the district court has a provision that no water will be delivered if it violates the Endangered Species Act. Is that correct? Your Honor, that provision does not apply to the settlement contract, which we were just talking about. No, it doesn't. It applies to the others. It applies to all of the water. This no liability provision applies to all of the water subject to the Delta Mendota Canal contract. Now, there is a limited no liability provision in Article 3I of the settlement contract. That liability provision, according to the district court's reading, only applies to a small portion of the water provided under those contracts, which is called project water. That's less than 20 percent of the total contract water. And the settlement contractors here have actually disputed even that reading and said that their water deliveries cannot be reduced for any reason other than the limited very dry year provision that's in their contract that allows them to be reduced by 25 percent but for no other reason. Now, turning to the issue of mootness, the question for the court is whether defendants have shown that the issuance of the 2008 biological opinion means that no possible relief is available for the claims at issue. As we've already touched on, defendants can't make that showing because the Bureau has not yet conducted an adequate Section 7 consultation on the long-term contract renewals themselves. And if it did, the contract could be made far more protective of the smelt. The 2008 biological opinion didn't address the long-term contracts at all but took them as a given. It therefore didn't identify any changes to the contract that might be necessary to protect the smelt because they were explicitly taken off the table. And addressing the impact of water project operations as a whole on delta smelts is not the same thing as assessing the impact of these specific contracts and their terms on delta smelts. A contract-level consultation would allow the agencies to make the contracts compatible with rather than at odds with the protections prescribed in the 2008 buyout such as by reducing the overall contract quantities, increasing rates to reduce demand, or changing the timing of deliveries to reduce exports in the spring or reduce upstream diversions in the fall when smelts are particularly vulnerable. As this Court explained in Houston, the determination made in the 2008 biological opinion is essentially equivalent to the project's total available water supply and that's supposed to be the starting point for figuring out how much water is available for these individual water service contracts. Can I ask you just an informational type question? In the consolidated cases, the other cases, the contractors have sued to undo the biological opinion, the 2008 biological opinion. And apparently there's been some ruling by the district court that invalidated a portion, a few provisions of the 2008 biological opinion. Is that correct? That's correct, Your Honor, and that's another reason why. Doesn't that just eliminate any argument about mootness? Well, we believe it does. Yeah, because the 2008... Doesn't that just end the story about mootness? The question, again, is whether this Court can't provide any additional relief. And the 2008 biological opinion, parts of it have been invalidated by the district court now in a December ruling. And so, you know, whether it provides any adequate relief going forward to protect the smelts is highly questionable at this point. Is his ruling on that issue, is it final yet? Final judgment has been entered, yes. And was there an appeal file in that ruling? Yes, the environmental groups that intervened in that case, two of which are plaintiffs here, have appealed that ruling. I think I'll reserve the remainder of my time for rebuttal if I may. May it please the Court, my name is Robert Oakley. I'm here from the Justice Department representing the federal defendants. I'll be taking the first 10 minutes of the time, and then counsel for the water contractors will be taking the remaining 20. Let me go first to the 2008 file because, Your Honor, Judge Pius has indicated why doesn't that just end the district court's ruling, just end the mootness issue altogether? Actually, we think it strengthens the mootness issue first. Let me be clear that although he found the opinion arbitrary and capricious, he did not vacate it. The reasonable and prudent alternative, which, and this gets confusing because the people I'm sitting with, some of them anyhow, are challenging that reasonable, prudent alternative, and the people on that table are supporting us on that reasonable and prudent alternative, but it stayed in place. The judge did not vacate it. Well, the argument, as I understand it, is that the contractors are somehow or another tiered to the 2008 ruling. They tiered – well, that's an interesting point, Your Honor, because they tiered originally to the 2004-2005 biop. There's this argument going on that the 2008 incorporated the earlier 2005 and 2004 opinions. No, I don't think it incorporated the 2004 and 2005 biop, but it was a new biop. It incorporated additional work and some of the interim measures the district court had imposed, and it did look and conducted various modeling on the various operations under either the Delta Mendoza contracts or the SRS contracts, and it projected that out, and it projected it out, and it found if nothing were done, there would be jeopardy, but that if this RPA were instituted, jeopardy would be avoided. And this is an important point, because I think it's obscured by NRDC. NRDC is entitled, the Delta Smelt are entitled to have the Central Valley Project operated so it will not jeopardize them. They are not entitled and could not overturn a biological opinion simply because something which doesn't jeopardize them could be made yet better for them. In other words, because that was repeatedly pointed out as an injury that if we went back and looked at these contracts, maybe there would be terms that would make things even better. No, but I guess my only concern about the argument is, as I understand it, on the mootness issue, the argument is this appeal takes its root in light of the 2008 biological opinion, which resolved everything. I don't see how it can possibly be a very strong argument now in light of the fact that provisions of that 2008 biological opinion are out of the picture. Well, the argument, what the district court ruled is that for various reasons the 2008 biological opinion, in his view, was either not founded on good science or didn't examine certain factors, but the challenge came in that case that it tied up too much water for the Delta Smelt. The argument here that Your Honor is being asked about in terms of being moot is NRDC's challenge. NRDC challenged the ratification of these contracts because, in the first place, the judge had found the 2004-2005 bio arbitrary inclusion. That was not appealed. So the only question then is, was that affected by the 2008 biological opinion being issued for NRDC? NRDC's claims were not that the tiering was wrong. It was that the underlying biological opinion is wrong. As far as NRDC is concerned, the 2008 biological opinion is not wrong. They've already filed a notice of appeal. You recall Judge O'Grady asked a question to NRDC when she was out there arguing, right? And his question was, didn't the 2008 biological opinion also address the contracts? Yes. And if you... Where in the 2008 biological opinion is there some, you know, analysis and discussion or whatever you want to call it of the contracts? Page 367 of the Federal Defendant Supplemental Excerpts of Record. Also, page 705 of the Federal Defendant Supplemental Excerpts of Record. And then we also included material from the biological... You know, I know you're intimately familiar with the records. I'm sorry. But let's... Yeah, why didn't I tell you what I thought? I must admit, you know, the amount of material for this case is enormous. It is. And I just don't have committed to... I know. Of course you don't. But those specific pages that you just listed... Well, I did want to get the page numbers out. What they do find when you look there is the models that they said, okay, what if we deliver 50% of the water that the Delta Mendoza contracts are entitled to? What will those impacts be? What if we deliver 80%? What if we deliver 0%, which is actually possible? What if we delivered 75%, which is under the SRS contracts, the settlement contracts, that would be the reduction under... They have very different reduction requirements or contract terms for their base supply. And so they model these various different levels. And I'd also point out that if you go back to the hearing that was done or the analysis that was done for the original biological opinions that were issued in 2004 and 2005, for the Delta smelt, it's really one line in concurrence letters issued for both sets of contracts, which says, we rely on the biological opinion for the overall operation of the Central Valley Project. And so it's not like that there was some great analysis, and yet in those letters, that was not carried through. They simply cheered for the smelt to the OCAP buyout. What we're saying is, and what the district court judge pointed out, is, look, they never say, NRDC doesn't say, it's wrong to cheer to the biological opinion. What they say is, you cheered to a lousy biological opinion. Then we come out with a biological opinion, which they like more. They help us defend it in front of the district court. They've already filed a notice of appeal. And so it seems that their claim, that the smelt would be put at jeopardy under the 0405 biological opinion, is now moot. Okay. I don't want to waste all your time on mootness, because I do have a few other questions for you. Is it the Bureau of Reclamation's position that it has no discretion? I guess it would be with the SRA contract. No discretion so long as the water is being put to reasonable, beneficial use. Yes. The base supply of water. Is it the Bureau's position that they could negotiate other terms of the renewed contracts? Yes. They have some discretion to say, look, we want to do this. We want to charge these rates. We want this for the project water, or we want to release it here. We want to do some other things. These are all on the table. That's discretion, right? Reclamation has discretion to ask. But as to the amount of base supply, again, as long as it's being put to reasonable, beneficial use, no. But as to other terms of the contract, yes, they would have had discretion. But the key terms here are amount of base supply and project water. Do you understand the NRDC's argument to be just all about the amount of water? No. They have made some arguments that timing could be altered to benefit the smell. Whether that would violate the reclamation's obligation under the SRS contracts, I think we'd have to see under a specific provision. But it's primarily about water. Certainly their concern is that these contracts, because they do have tight restrictions on reclamation's ability to reduce delivery. Well, they don't really deliver to them. But to reduce the water that is diverted by the SRS contractors, it's that the SRS contracts lock up a lot of water for 40 years. That's, I think, the thrust of their arguments as opposed to the timing. But they do mention timing, yes. And I guess the other question I have for you would turn to the Delta contract for just a minute. And that is, why does the no liability clause for the right of the Bureau to order some compliance, I guess, comply with law? Why does that cut off causation for purposes of sanity? I think it does because, and this is not speculation, the historical record shows the fact that contracts themselves say, the renewed contracts say, in many years, the Delta Mendoza contract users will not get their contract amount. And historically, many years they have not gotten their historical amount. So if there is an obligation of law such that reclamation is going to be out of compliance with the Endangered Species Act, if we supply all of the water that is due them otherwise under the contracts, then we're going to short them under the contracts. And I see I'm just about at my time. I didn't mean to. My colleagues may have questions of the government for your position. No, I'm fine right now. Thank you, sir. Thank you. May it please the Court. My name is Daniel O'Hanlon. I am counsel for the San Luis and Delta Mendoza Water Authority. Members of the San Luis and Delta Mendoza Water Authority are the Delta Mendoza Canal or DMC contractors. These are the contracts under which the Bureau of Reclamation can reduce deliveries to zero percent, if need be, to comply with the requirements of the Endangered Species Act. The Court asked the question, why doesn't the White House district court, recent district court rulings regarding the 2008 biological opinion moot? Why do they mean that that biological opinion still moots the case? In other words, the federal court can't create any effective relief. The court here, in the district court, found the biological opinion to be flawed, but it did not vacate that biological opinion. The 2008 biological opinion is still in effect and is still governing project operations today. What the district court ruled, told, and my clients are among the plaintiffs in that case, is that if you believe that the problems in the biological opinion are causing you harm and you can meet the standards for preliminary injunctive relief, come back into my court. That is the rule. That is the posture we are in in that case. But the 2008 biological opinion is still in effect, and the final judgment that was entered expressly provides that it has been remanded to the Fish and Wildlife Service without vacancy. But the argument is, part of this gets all very confusing, is that the contract was tiered to the 2008 biological opinion. Now we're told that part provisions of that biological opinion are no longer any good and they're off the table. Is that right? No. No? The tiering that occurred with respect to the original renewal of the DMC contracts was in relation to the 2005 biological opinion. And the tiering that occurred is there was a biological opinion that addressed all project operations and the effects of all project operations on the Delta smelt, including all project operations necessary to pump the water to deliver to the DMC contractors. Then they tiered from that. And the 2005 Fish and Wildlife Service issued what is known as a concurrence letter, tiering from the 2005 biological opinion. The concurrence letter did not address the Delta smelt. It addressed various terrestrial species, in particular for the DMC contractors, the San Joaquin hit box and the giant garter snake. It did not address the Delta smelt because by design, under a two-track approach to consultation that was set up going back to the year 2000, they analyzed all the facts from project operations in the so-called OCAF, or Operating Criteria and Plan Consultation, and other aspects of implementing the CDP in separate consultations that then rely on that OCAF analysis. What happened in 2008 is we got, in response to the district court's order below, the 2005 Fish and Wildlife Service issued a new biological opinion regarding operations of the project. They found jeopardy with respect to the smelt. Yes. They found that operations in toto jeopardized the species and adversely modified its critical habitat, but that the project could continue to operate if it complied with what was known as a reasonable and prudent alternative. A reasonable and prudent alternative that requires changes to the operations of the project to avoid the consequence of jeopardy or adverse modification. That's what's in effect under the 2008 biological opinion today. Okay. Now, did the 2008 biological opinion address the separate contracts? Yes. It addresses all operations necessary to deliver water to these contractors, including these contractors. And the assumptions that were made for the analysis, there are two documents that are important in a consultation. One is the biological assessment. Their reclamation said we were projecting modeling operations to delivering up to full contract quantity to the DMC contractors, as well as other operations and demands. And then the biological assessment coming back from the Fish and Wildlife Service for its analysis of impacts on the delta smelt assumed, again, full contract, up to full contract deliveries to the delta mundota contractors. So, yes, the 2008 biological opinion does address all project operations necessary to deliver water to the DMC contractors. Now, can the con ‑‑ I guess the argument is that the release that NRDC is seeking goes beyond jeopardy. That is, it makes potential release of the delta smelt even better. Is that what the argument is? That is part, yes, that is part of what they're, they appear to be seeking. They're looking for, well, first their claim that's before the court and their third supplemental complaint relates only to the 2005 biological opinion. But what they're asking for is a further consultation on the execution of the DMC contracts. That really has never taken place, correct? Since the 2008 biological opinion was issued, there has not been a reconsultation regarding the DMC contracts. There really wasn't one before, it was just here. There was a consultation, but for analysis on the delta smelt, they relied on the OCAP biological opinion. And, by the way, the delta smelt is the only species that forms the basis for the NRDC's claim. But if I can get to the court's point, the consultation that they're seeking would not be an effective remedy for the violation they're alleging in their complaint. It would not be an effective remedy, because that consultation on the renewed, on executing DMC contracts would not address the delta smelt. Again, by the two-track design that the agencies have established and that has never been challenged, the effects on delta smelt are addressed in the OCAP consultation. If there were a new consultation on the contracts, they might address impacts to terrestrial species again, such as the kit fox or the giant garter snake. But that's not a remedy for the only claim that's before this Court. And that's your argument as to why there's no standing? That's the argument. First, why this case is moot. But the same facts support the district court's ruling regarding standing. And the injuries that NRDC has referenced to the smelting sucked up into the pumps, it doesn't show, in your position, it doesn't show sufficient injury to come under the Supreme Court's Summers v. Earth Island Institute and show the real harm that's necessary? The focus of our argument relates to the procedure that they're seeking. The procedure that they're seeking, reconsultation on entry of the DMC contracts, wouldn't address the effects to the smelt. Their entire argument ignores the two-track process that was laid out by the agencies for very good reasons, very practical reasons. The CDP is a very complicated endeavor. They have, and there's a long history of consultations involving the CDP. They didn't want to have to redo that every time they did something on the periphery related to the Central Valley Project. So the procedure that they're asking for here wouldn't address the issues that they're raising with respect to the Delta smelt. And the district court could order them to take care of the Delta smelt in any renegotiation or any re-evaluation? Well, under the claim that has actually been alleged and asserted in the third supplemental complaint, that would not be an appropriate remedy for the claim that's been alleged. The council has argued that there are a few terms that could be changed in these contracts. I'd like to briefly address those if I could. In terms of contract quantity, there's a right to renewal by statute that's established in Section 3404C of the Central Valley Project Improvement Act. It's also established in the 1956 Act, which is codified at 43 U.S.C. Section 485H-1. There's a right to renewal at a stated quantity of water. Reclamation... Stated quantity for that term is... Yes, it is. It's in the 1956 Act. The CDPIA slightly modified the renewal provision in the 56 Act because it took it from a 40-year contract term to a 25-year contract term. But it didn't modify the portion about stated quantity. And when Reclamation entered these contracts, it did a NEPA analysis. There was an extensive analysis of what the options and the alternatives might be. And Reclamation understood and said in its NEPA documentation that not renewing these contracts at the existing quantities was not an option unless the needs assessment indicated that these contractors couldn't put the water to use. And what the needs assessment for the DMC contractors found was that not only could they put this amount of water to use, they were actually water short. So that is why Reclamation renewed these contracts as it did for the stated quantities. Finally, with respect to the pricing terms, those are... And they're described in the DMC contract in Article 7. Those are a matter of federal law, reclamation law, and rate-setting policies. The general policy is to recover operations and maintenance costs and capital costs over time. Those are terms that are largely set by law. That's what the contracts essentially provide. Let me give you a thought of what my preliminary thoughts are on this case. You can then address that. With regard to mootness, I think it is not moot because there is a challenge to the validity of the And that hasn't been addressed yet. With regard to standing, it seems to me that there is no standing because of the fact that the contract with it violates the Endangered Species Act, that there is discretion to modify those contracts in order to be in compliance with the Endangered Species Act. And so it would seem that the time that that would come to a decision is if the ruling on that contract says, no, it doesn't violate the Endangered Species Act, then there would be an ability to appeal that question of whether that was error. So that at this moment, it seems to me that it's premature to rule on that, and therefore because of the provision in that contract, there is no standing. And we would agree with the Court's comments on that point. In fact, there has never been an instance under this contract where the terms of the contracts have prevented reclamation from doing whatever was necessary to comply with the Endangered Species Act. If and when that ever occurs, that would be a different case. As I understand it, with respect to the Delta-Mendota Canal unit contract, there has been litigation over whether or not the Bureau can invoke that clause to assert protective rights under the Endangered Species Act. Not in the recent litigation, there has not. Instead, all the arguments have been whether the Fish and Wildlife Service did a proper job in analyzing the science. And maybe this just dovetails into what Judge Hugg was saying. I guess maybe it's premature, at least from your perspective, but I gather if the Bureau were to take that action, there might be some response by the Delta-Mendota. If the Bureau were to take action to reduce deliveries? Yes, on the basis of the Endangered Species Act. In fact, it has done that. It has done that. And deliveries have been great. No, Your Honor, absolutely not. But what we said was those reductions weren't justified under the ESA and the best available science. We did not say and have not contended that the terms of the contracts prevent them from doing that, because clearly the terms of the contracts allow them to do that. Thank you, Your Honor. That's a whole other area that potentially breaks the litigation. Yes. Your Honors, my name is Stuart Somack. I represent the Sacramento River Settlement Contractors. And I think what I'd like to do in light of time limitations and the fact that there are some questions that have been posed, I'll just jump right into some of the issues that the Court has inquired about. I'd like to initially, though, in terms of setting the stage, so to speak, remind the Court that the Sacramento River Settlement Contracts are geographically much further north than the Delta Smelt Habitat is up in the Sacramento River, going all the way up to the city of Reading at the very end of the Sacramento Valley. These are users who drew their water directly from the river, correct? They're direct diverters from the Sacramento River. They divert under water rights. They go back, some of them, to the 1800s. They predated the Central Valley Project. They protested all of the water rights associated with the Central Valley Project. And the settlement that is encompassed within the four corners of the contract we're talking about was urged upon the contractors and the Bureau of Reclamation by both the United States Congress as well as by the State Water Rights Board. And so it encompasses the idea of not trying to get into the pernicious, long, I think Congress referred to it as the monster adjudication of the Sacramento and San Joaquin River systems and all of the tributaries to those systems that it was better to settle than to move in the alternative direction. And so that's what happened. And those discussions took a very long time, and the first contracts were entered into it in 1964. Those contracts are unique. They guarantee in Article 9 certain set quantities of water to the contractors. They not only indicate that those waters are the contractors' water, but the provisions of Article 9 say that the presumption will be that the contractors are actually diverting water under their own underlying water rights, not under the government's water rights. There's only one shortage provision in the contract, and it applies to all the water under the contract. And that shortage provision is triggered by inflow into Shasta Reservoir. It's totally based upon natural hydrology, and, of course, the reason for that was and is the fact that the underlying water rights are based upon the natural hydrology. And so that's the only shortage provision that exists in the contract. Yes? So that all caught my eye as I was reading the material, and I noted that when I was questioning NRDC, but I don't understand their argument to be simply limited to quantity. That was my question of the government. Yes, and let me address that then very specifically. The question of whether or not any of those other provisions would have any impact upon the Delta smelt is a... Take it one step back before that. Yes. So I asked the government whether they believed they had any discretion regarding any terms in renewal contracts, and the government said, yeah, we do, some, limited. But not Section 782 discretion. Why not? Because under Sierra Club v. Babbitt, discretion has to inure to the benefit of the protected species. It's not a unfettered discretion. But even some of these other measures that counsel just went through in her presentation also inure to the benefit of the species. Because they're caught up in other mandatory provisions. I mean, you can only deal with what NRDC has kind of thrown out, and there's nothing in the record, number one, to suggest that any of that would inure to the benefit of the species. But if I take the issue she raised, let's take timing, for example. Contracts are very specific as to timing. There are monthly restrictions. Every month of the year is allocated specifically within the contract, and the reason for that is prior to the contracts, there were no limits on diversions other than the maximum level, which took place across the entire irrigation season. And so one of the benefits the government got out of the deal was to reduce those diversions on a monthly basis. And so timing can't be adjusted under the contract because it's one of the material quantity shortage provisions in the contract. Pricing was the other issue that she raised. Pricing is mandated by Federal law. You look to the 1939 Act, which we cited, which allows for pricing, and those pricings are the allocated proportion of the capital cost of the project so that the project gets repaid for that little portion that we pay for. O&M charges under the contract. And then under the Central Valley Project Improvement Act, there's a restoration fee that we pay. The notion of using pricing as a mechanism to reduce the amount of water that we would utilize to perhaps benefit the Delta Svelte is precluded by law. That's Central Valley Project Improvement Act Section 3405D, which actually is a mechanism that Congress decided it was going to use with respect to water service contracts and repayment contracts. It was an additional pricing provision that Congress enacted, specific and what it was as a tiered pricing. So you paid more for the more water you used. That doesn't apply. There's no application of that by the very language of the statute to the contractors. So the only thing that we can be charged for is capital cost, the restoration fund, and O&M costs. And all those are set formulaically. So there is no pricing opportunity. There's no discretion that could be exercised in that regard. And that's one of the interesting issues about the contract. And the district court referred to this in its discussion of Article 2, which is the renewal, the 40-year renewal. These contracts were first entered into in 1964. The price of water was written into the contracts. And it also couldn't be adjusted during the term. It was $2 an acre-foot for water. The purpose, and you'll see in the district court's decision, it recites, quotes Article 2, which says for the purposes of pricing, we're going to reopen this in 40 years. And so really the only mechanism for real reopening and the only purpose for having a renewable was not to look at all of the things that were water-related, but rather was to update the pricing mechanisms. And, in fact, the pricing mechanisms were updated. And I think we pay an average of about $35 an acre-foot. And we had to make up all the O&M deficits that accrued during that entire period of time. So there's just simply no question. The plaintiffs have a claim that contests the validity of those contracts themselves. As I understand it, the court has not ruled on that. Why shouldn't that be a requirement to rule on that question? Well, I believe that the contracts have been determined to be valid. They were validated under state law, as they're required to be. And I don't know of any challenge to their validity other than the Section 7A2 challenge that's being made in this case. I actually am not aware of any underlying argument that the contracts aren't valid. They've made an argument somehow that we have to adjudicate our underlying water rights. But I don't know of an argument that they're making that their contracts are not valid. That argument would have had to have been made under the state validation statutes, which are a requirement of reclamation law. And they were done, and there was no challenge to those contracts under those validation provisions. I'd like to just, because I don't know if I have any time left over, but I wanted to make this note. We've never argued that these contracts or the contractors are not subject to the Endangered Species Act. And that's one of the arguments that NRDC usually makes, and they made it in their briefs here. What we're saying is we're not subject to 7A2, but that the Endangered Species Act is much broader than Section 7. It includes Section 9, which is a pretty punitive section. And the record should note, and in fact, I know this was cited in the various briefs, the Sacramento Settlement contracts have been shut down under Section 9 when their defective fish screens were taking listed species of fish. So it's not as if we're sitting here and saying we're immune somehow because of our state water rights, because of Article 9, because of all of that stuff from the Endangered Species Act. Far from it. What we're saying is Section 7A2 does not apply to these contracts. Certainly, the Endangered Species Act writ large in terms of Section 9 certainly applies to our independent diversions of water under the contract or under our underlying water rights, just as it does anybody else. And we know that very painfully and very personally because of past experience. The district court, on the question of standing, rejected it. Well, I'll say affirmatively, said that there was an NRDC that had standing to challenge the RF. We think we have standing to challenge the contract, and we don't think the district court's order with respect to our contracts is moot. We think that this is certainly a lot of controversy and that they have standing under... The whole point is just that Section 7A2 just doesn't apply. It doesn't apply. Because there's no discretion. No Section 7A2 discretion. 7A2 discretion. Okay, I got it. Thank you very much. Thank you. Let me start by responding to the Council for the Settlement Contractors argument, since we've just heard that one. Now, as I understand the argument that the Settlement Contractors Council made, it's that the Bureau had no discretion to change any terms of these contracts on renewal that would in any way benefit the listed species at issue here, the delta smelt. And that argument is simply not reconcilable with what the Bureau actually did here. Because the Bureau actually did change several terms upon renewal that do in fact benefit the smelt. They reduced water quantity terms by a total of more than 170,000 acre feet, which is a big chunk of water that can then flow into the delta and improve the habitat for the delta smelt. They increased project water rates. And let me just briefly address the issue of the Bureau's pricing discretion, since Council for both contractors raised it. While pricing is established according to a set of statutory criteria, the Bureau has a lot of discretion in considering how those criteria are implemented here. And one of the key issues is that the Bureau is supposed to recover the investment that the federal government made in the Central Valley Project by a date certain. And their investment, the recovery of that investment, depends on how much water is delivered. For example, they can't recover $10,000 in investment in 10 years if they charge less than $1,000 an acre foot. So if less water is available for delivery to the contractors overall, which is what the 2008 biological opinion tells us is our current state of affairs, then they have to increase project water rates in order to meet that repayment obligation. So there is discretion there. And the record reflects that that discretion can result in a decrease of water diverted under the contracts. For example, in the Fish and Wildlife Service concurrence letter on the contracts, at excerpts of records 1798 to 99, they explain that higher project water rates may result in the decrease of water diverted under the contracts. Now, let me turn to the question of standing. Again, the question here is whether plaintiffs have shown that the contracts at issue could have been more protective if their procedural relief was granted, which is an adequate Section 7 consultation. Defendants have tried to characterize this as we're trying to impose a higher standard than Section 7 imposes on the re-consultation, something beyond no jeopardy. And that's not at all what we're seeking. What would happen under a Section 7 consultation on the contracts themselves with the question understanding, which is whether these contracts could be made more protective of the smelt and thus reduce plaintiff's injury? And because of... Let me ask you this. What happens if we were to agree with you that, at least with respect to the Delta and Dota canal unit contracts, you had standing? What happens next? Well, what happens next is that... Because the district court knocked it out on standing, right? That's right. Didn't get to the heart of your argument. Well, the merits in this case are actually pretty easy. And the district court did opine with regard to the settlement contracts that the consultation was clearly inadequate. And for the same reasoning, that conclusion has to apply to the Delta and Dota canal contracts because... Refresh my recollection. Why did he say it was? Because the concurrence letter, the second tier, the tiered consultation that was conducted in 2005, relied wholly on the 2005 biological opinion for the analysis of the contract's impact on the smelt. And the district court concluded that that 2005 biological opinion had several significant flaws. The Bureau was arbitrary and capricious in relying on it, and nobody's appealed that decision. Judge Hugg addressed another issue about standing. I think with respect to the Delta and Dota contracts. As I understood Judge Hugg's comment, it was based, again, on this no liability provision. And, again, I want to be clear that the question here for standing is whether the contracts could be made more protective of the smelt if an adequate consultation was done. And that no liability provision only offers very limited protection because it promises an excessive amount of water. And the Bureau tries to deliver that excessive amount of water until smelts are actually harmed. And only then does it begin ratcheting down. It has the ability to do that ratcheting down under the no liability provision, but that is less protective ultimately than if the contracts were based on a reasonable quantity term in the first place, which would avoid killing smelt in the first place. And, in addition, that no liability provision doesn't address any of these other terms like timing, pricing, conservation requirements, all of which could have a big impact here because these two sets of contracts have different seasonal impacts on the smelt, which could be modified by looking at the timing provisions. And in the case of the Delta and Dota contracts, it's the exports in the spring that are really a problem. And it may be that reducing those exports and shifting the timing of deliveries would provide much more protection. Now, there seems to be an argument that the 2008 biological opinion did address the contracts because the biological opinion looked at varying levels of deliveries under these contracts. But that is not at all the same thing as looking at these contract terms and the Bureau's decision to renew these contracts on a specific set of terms and how that might affect the smelt. Why doesn't that take you out of the imminent harm that the Supreme Court talks about in Summers? Why doesn't at least the 2008 BIOS, which looks at and determines how to more safely protect through timing of when water is going to be withdrawn, do the equivalent of what you're asking us to send back to the district courts that do now? Well, with regard to the imminency of harm, Your Honor, as Judge Paez pointed out, the 2008 biological opinion has been invalidated. So how long its protection stay in place is an open question. They've heard a different argument. I didn't understand that the terms that we're attempting to render have to have some safety grounds invalid. They were, Your Honor. Several of those terms have been called into question. Those are the terms in the reasonable and prudent alternative. And the court has remanded that back to the agency to take another look at. NRDC is on the side of the government in that review. That's right. Again, we think those protections are necessary but not sufficient to protect the smelt. And while the district court has not vacated that opinion during the remand period, that doesn't mean those terms are going to stay in place for very long or that they will be extended once the remand is complete. And which begs the question, why deal with it here and now versus when the case is sent back to the district judge after review pending appeal? When you have a record on the 08 FIOS versus 2005 and you have a final decision as to what portions of the 08 FIOS are actually going to remain in which case, for that entire matter, can you come back up to the Court of Appeals and want to argue? Well, Your Honor, to understand your question correctly, the issue is the relief that we're asking for in this case is for constipation on the contracts themselves and the Bureau's decision to renew these contracts on a specific set of terms. Now, if you look at the 2008 buyout, that hasn't been done in the 2008 buyout and won't be done in the remand of that buyout without some additional input from this court. Now, plaintiffs don't have a concern about how that's done in the sense that we have not said that peering it, peering that consultation off the broader programmatic biological opinion is the wrong way to do it or whether you can do it as a stand-alone consultation on the action of executing these contracts. It can be done in a variety of ways that could be valid under the law, but the point is it has to be done somewhere and it hasn't been. Thank you. If there are no further questions, I think I'll submit to each case. Your Honor, any further questions? No questions. Thank you very much. Okay. Thank you, counsel. Counsel, we appreciate your arguments on this case. Very interesting. And it seems to have taught us paperwork. The matter is submitted. Thank you. Thank you, Your Honor. All rise.
judges: O'grady, Hug, Paez